Okay, Ms. Yannaris? Good morning, Your Honors, and may it please the Court. My name is Valerie Yannaris, and with my co-counsel, Ms. Melanie Finch, I represent the plaintiff and the appellant, Springboards to Education. Almost four years ago, in December of 2018, we were back, we were in front of a different panel in this court, and for a different case, Springboards to Education v. Houston ISD. That panel decided to affirm the district court's dismissal of that case, not on the grounds that it had requested dismissal for no commercial use, but on alternate grounds. Those grounds were a lack of evidence in the record for access to my client's program, and then also of actual confusion. And after the decision in that case, we took that decision as a roadmap to undertake discovery in the remaining cases down in the Southern District of McAllen. There were five cases remaining at that point in time. One of them was dismissed, LaGuardia was dismissed on prior use. The four remaining cases, we had two months to complete discovery. We took 40 depositions in a matter of a month, worked over weekends and over holidays, and one of the days that we took depositions was on eight different witnesses for actual confusion. We have that evidence in the record, and I believe that the panel that looked at the Pharr-San Juan-Alamo case that affirmed that dismissal, there was an absence of actual confusion in that record. In the McAllen case, we do have multiple instances of actual confusion. Courts have decided that this is the most important factor when it comes to likelihood of confusion, and that when you are looking at a trademark case, you actually need to have the likelihood of confusion digits assessed by a jury, and that was in the Society of Financial Examiners versus National Association. Okay, I appreciate that you're saying the way you're going to get around the Houston case is that there's a different evidentiary record, okay. So, with respect to confusion, who are the people, given this somewhat unusual, I guess, product that we're talking about, who are the people who are going to be confused? Thank you, Your Honor, and that was one point that I wanted to clarify. I believe at oral argument in the Houston ISD case, my co-counsel said that the parents and the students were not the end purchasers and did not need to be confused, but that's not the law. The law is that if there is actual confusion, then that shows that the Lanham Act is being violated. In this case, we had evidence in the record that parents, teachers, librarians were all confused as to the source of the products that were at issue, that being the banners, the tabletop signs, the medals, the pencils, the things that had my client's trademarks, federally registered trademarks on them. And when, in the issue here, that confusion came because the products that were offered by the districts that were infringing were of inferior quality. My client's program is a wonderful program. You can find it in the record at our complaints and our motion for summary judgment and our responses to the motion for summary judgment. Springboard's education's reading program is a very colorful, kind of boisterous program that gets the kids excited about reading. I appreciate that, but can you give me a concrete example of confusion in this record that just can illustrate to us a product, a trademark, someone's using the trademark, someone's confused about the provenance of the mark? Yes, Your Honor. So we have, and McAllen has in their response brief, four examples of misuse of the marks. All four of those actually carry one of the marks at issue here. We have evidence in the record of parents that have seen social media postings with millionaire reader on it with students wearing a t-shirt or having a pencil or a medal. And the parents seeing that and thinking, oh, okay, that's Springboard's education's millionaire reader program, and that that must be where the students had gotten those products from, when in fact it was actually McAllen ISD or the individual schools that had been putting my client's trademarks on their own products and distributing them to the students, putting that information out there on social media and passing it off as their own reading program. Because of the goodwill that has been garnered by Springboard's, by its success with that districts were taking those phrases and putting it on their products so that they could get the students excited in the same way about the reading program. So it was the students that would go and receive these products that they believed that they were getting Springboard's education's products. And the teachers, I'm sorry, the parents that were seeing these products as well thinking that, oh, okay, that's the quality of the reading program that my students are getting when in fact it wasn't the same thing. We agreed with you on that point that, okay, now there's evidence of confusion, and so that changes the result. Do we then have to get to the commercial use point that the Houston panel decided they didn't need to get to? Your Honor, I believe the Houston panel, there was one example that Justice Owen explained in oral argument where students are going into a cafeteria and they get a carbonated drink from the cafeteria and it was put into a Coca-Cola cup and, you know, isn't that infringement here? And kind of along with that, what is happening is you're taking money away from Coca-Cola by using their cup and putting your own carbonated beverage in there. That's what's happening here with Springboard's. Springboard's would be the company that the school districts are contracting with, and actually Edinburgh ISD does contract with, and Springboard's, the last two years I was speaking with a client yesterday, has made $275,000 a year. Now that the infringement has stopped . . . But wouldn't you have to show that the use of the allegedly confusing, the allegedly infringing marks, the millionaire reader by some other school district, McAllen, wouldn't you have to show that that is commercial use? Is that what the statute requires? Well, it is commercial use. It affects . . . Why is that? Because McAllen's not selling their millionaire reader program, are they? Understood, Your Honor. So it's the effect on commerce, and that's what's happening here is Springboard's is being affected commercially by not getting this person . . . What does the statute say, though? It does discuss use in commerce. Okay, so use in commerce. Yes, Your Honor. It doesn't say effect in commerce. It says use in commerce. In advertising as well. So this is something that we discuss in our briefs. The advertising by the ISDs about the reading programs that they're using is sufficient in order to have that effect that's necessary. And there are . . . They're not advertising it for someone to buy it, right? They're not trying to market it, are they? They don't want another school district to buy it. I'm sorry? McAllen doesn't want another school district to buy their millionaire reader program. No, Your Honor, but again, it's the commercial effect on Springboard's. What's your best case for the Lanham Act, the commercial use requirement is satisfied because of the effect on commerce by the allegedly infringing mark? I believe that the court discusses that in the Elvis Presley case, that there are . . . Number one, that confusion is very important, but in the advertising, that's where the injury can come about. And that's why some of the claims were remanded back to state court to be tried on the merits was because the advertising of the trade dress, which is actually very similar to our case here, is what the court thought was important. I just, I thought, correct me if I'm wrong, I thought our circuit had weighed in on a commercial use requirement for Lanham Act claims. Other circuits have, but our circuit hasn't. That's correct, Your Honor. The other circuits have. McAllen urges to follow the other circuits. Here, there are many cases where there isn't an actual sale. It's the advertising. It's the effect on commerce that's at issue here. And the underpinnings of the Lanham Act is to protect consumers from confusion so that they get the quality of goods that they are bargaining for. And then also for the individuals that actually take the initiative to go to the patent and trademark office and procure the exclusive right to these slogans and to these source identifiers. And that's, you know, the protection of that exclusive right is really what the Lanham Act is for. I do want to address briefly one of the arguments McAllen brings up as to ornamental use and then a concern that the Fifth Circuit had about our describing of the campaign. A couple of courts have said this isn't a patent case. We understand that this isn't a patent case. However, the Lanham Act does protect trade dress, and that's something that the Elvis Presley Court looked at as well. The reason why Supreme Court's education has such notoriety and critical acclaim was because the amount of work that the owner of Springboard State Education, Mr. Lopez, has put into his program. He graduated college at the age of 18, had his master's three years later, and solved this issue of readability. Took that research that he did and put it into a packaged program to get kids excited about reading. This was done back in the early 2000s when— Is Springboard marketed outside of Texas? Yes, Your Honor. What other states is it marketed in? So it was originally, when it first kind of made its debut, its debut was at a conference in Chicago. It does business in Nevada. It's had business even over in Africa and Costa Rica. It's been marketed all over the place. Has there been litigation in other circuits, Springboards versus other school districts? Yes, Your Honor. Because I know, obviously, we have a few cases. Are there cases from other circuits that we need to be considering? Which ones? So there were 16 cases filed back in 2016. 16? 16, Your Honor. 16. Yes. And some of those were sent—there was one that was sent to Tennessee. There was one that was sent over to the Middle District of California. None of the other cases have been taken to trial. The closest one that we took to trial was the Demco case. And that was settled on the eve of trial, right before we had our arguments out here on HISD. We had a few cases that were with some school districts. There were some that were with some private companies. We had one with a charter school that I'll address in our next conversation. But all of the cases that we did file have been settled. But for HISD and the cases that were in front of this circuit, the PSJA and the other ones. The exception of La Jolla that was, as I discussed earlier, dismissed on prior use grounds. I do want to address briefly the ornamental argument that McAllen makes. Again, I think Elvis Presley is a really good case, in addition to amazing spaces, for our case here. The Springboard's trademarks that we have asserted are not ornamental at all. They're a source identifier. And that's what the Lanham Act is here to protect. When students see the millionaire reader, especially in the context that we have here, which is why we believe we have counterfeiting, in the context of the parties that are thrown, the red carpet and the limousine, the goodwill that has been associated with Springboards comes through in all the extras, so to speak, that are in addition to the marks. But the phrase itself is not ornamental, it's a source identifier. McAllen makes argument about millionaire reader being in front of a picture of a student. I would analogize that to the word Girl Scout being used in front of a Girl Scout. If you're not describing the girl who's a Scout, you're looking at the trademark Girl Scout and it brings to mind the organization that raises girls to become independent and help the community and that sort of thing. And that's what we have here. We have the millionaire reader mark that signifies Springboard's education. All right, thank you, Ms. Norris. You've saved time for rebuttal. Mr. Williams? Thank you for the warning. May it please the court, Roger Williams here from McAllen School District. If the court has jurisdiction, the judgment should be affirmed for the reasons stated by the district court. No reasonable jury could find a likelihood of confusion and we also ask the court to affirm on the grounds that there is no evidence of commercial use. What do you do with, Ms. Gennaro spoke about additional evidence in the record, additional evidence of confusion that's different from what was in the Houston ISD case? The evidence of confusion in the record was characterized by the district court judge's friends and family evidence and that's an accurate characterization. But more importantly, none of the, two points, none of the evidence of confusion cited by the plaintiffs is tied to anything McAllen did. Like there was a, she mentioned a, counsel mentioned a t-shirt, a t-shirt. There's no evidence that that's related to anything that McAllen did. As this, there were a number of schools that they sued, all in Hidalgo County and there's no telling where that evidence came from. The other point is that it's clear when you read the transcripts of the depositions which we've cited in our briefs, that the confusion wasn't about the source of the goods. The confusion expressed by many of these witnesses was, hey, I thought Springboard's had the exclusive right to use this trademark. How can someone else use this mark? So, not confused about, about the source of the goods, but confused about what Springboard's legal rights are. The, turning to the trademark issues. Mr. Williams, I don't mean to interrupt you, but I just want to make sure I understand how you intend to use your time. Are you going to use this 15 minute block to do both the jurisdiction and the merits? Yes, Your Honor. Okay, great. I'm going to, I'm going to spend a little bit of time on the trademark and then some time on the sovereign immunity argument. Great. And I'm going to turn first to the trademark issues. The, assuming the court has jurisdiction, the, the court does not ride on a blank slate here. The, the previous panels of this court have already addressed the same plaintiff, the same trademarks, and similar if not identical claims in the Houston ISD case and earlier this year, the Pharr-San Juan-Alamo case. And as a result of those cases, there are no legal issues relating to the likelihood of confusion test that have not been addressed. Many of the, many of the specific facts relating to the likelihood of confusion test have already been established and ruled against springboard to education. And I just want to highlight right now one fact, the fact that the Pharr-San Juan-Alamo panel identified as decisive. This is from page eight of the, my slip opinion of the Pharr-San Juan-Alamo opinion, quoting one decisive fact remains the same, remains all the same. Sophisticated school district customers can tell the difference between goods springboard is selling and goods and slogans PSJA is not. That's the same as our case here. This court can and should, assuming there's jurisdiction, affirm the district court judgment on the grounds that no reasonable jury could have likely, could find likelihood of confusion for the same reasons found by the district court. We also ask the court to affirm on the alternative ground, again on the trademark issues, on the alternative grounds that there's no evidence of commercial use. And in order to do that, the court has got to find that there is a commercial use requirement in the Lanham Act claims at issue. And in response to one of your questions, Judge Dunton, the Fifth Circuit has recognized a commercial use requirement for the second prong of section 43A, 15 U.S.C. 1125A sub 2. That's the false advertising, the false advertising claim. But it has not done so for the statutory infringement count under section 1114 or the false association count under section 1125A1. And those are the claims where we're asking the court to find a commercial use requirement. There's a claim for infringement, I mean for counterfeiting, but that follows from the statutory infringement. There's no infringement without, there's no counterfeiting without statutory infringement. And there's also a dilution claim. The dilution expressly has a commercial use requirement. So the court doesn't have to find it there. So, as we said in our briefs, a substantial number of your sister circuits have concluded based on the express and implicit statutory wording and the constitutional underpinnings that there is a commercial use requirement for the statutory infringement and the false association Lanham Act claims. If I could just briefly talk about some of the policy reasons that are important here. One is that if there is a commercial use requirement, then that prevents the Lanham Act from being used to burden or suppress protected First Amendment speech. It's hard to do that with the likelihood of confusion test. And that was a primary motivation for the four circuits ruling in the Radiance Foundation and the D.C. circuits ruling in the FARA case. Second ground is that the likelihood of confusion test, the digits of confusion are well adapted to disputes in the commercial arena. But if the dispute involves speech or actors like a school district that rarely, if ever, venture into the commercial arena, the factors don't apply. They're a bad fit. What's your response to counsel's point that,  but they're advertising the marks, and that's enough to affect commerce? So in the Hisdy case, so my point and response is they're not advertising them within the sense of the Lanham Act. And we see that in the, that was already established in the Hisdy case, where one of the factors is advertising, and the court said, promoting the mark to the students, giving education, that's not advertising. So I think that's already been addressed in the Hisdy case. And what I heard counsel for Springboard concede is that McAllen is not offering these for sale to other school districts. The other point is that as a practical matter, if a school district is going to be liable, for non-commercial educational use of a mark, and if likelihood of confusion is the test, then it has no practical way to govern its activities to avoid inadvertently creating trademark liability. In the commercial sphere, if my client comes to me and says, we're rolling out a new product, here's the name, we're launching a new service, here's the name, then I do a trademark search. I've got a handful of names to search, and I can do a trademark search. If I find something's close, I can analyze it under the likelihood of confusion factors. That's what happens in the commercial sphere. But what we're talking about in the school sphere is a teacher or a librarian coming up with a new motivational slogan or a new lesson plan or a new reading incentive program. And the only way to ensure that there's no trademark liability would be a trademark search. But a school doesn't have the resources, and it should not have to do a trademark search every time it comes up with a new educational slogan or a new lesson plan. So what I'd like to turn now to, unless the court has more questions about the trademark issues, I'd like to turn to the sovereign immunity argument. And our position is that the district court, the federal courts, do not have jurisdiction over McAllen ISD because under the Clark factors, it is an arm of the state for Eleventh Amendment purposes. The first Clark factor is what do the state courts and legislature say? Counsel, is the city of McAllen an arm of the state? Is the city of McAllen... The city, not the school district. It's the city. I haven't studied that. I don't think that's... I think it's probably not. I don't know that... What about the county of Hidalgo? The county of Hidalgo, so far as I know, I don't think they are either. Wouldn't it be odd if the county and the city are not arms, but that the school district would be? I don't think it would be odd at all because the school district has a special status under the state constitution. It has a special status under the state constitution, and it has special funding requirements under the constitution. It has special funding sources under the constitution and the statutes of the state of Texas. So it gets some state money and some non-state money. Yes, that's correct. So if you look with me, let's look at the Clark factors. Let's look at the second one, which is the source of the entity's funding, which our court has said is the most important factor. Yes. In Clark, this is page 744 of the court's opinion, we say we held that the fact that a payment, this is quoting the court's opinion, could come from tuition fees, so in that case that's the non-state funds. Yes. And could come from state funds, did not change the 11th Amendment bar because the fees were commingled with other monies, and more importantly the fees have been factored into the preparation of the annual appropriation from the state legislature. Yes. So why does it matter that you get some state money and some non-state money? How does it move the needle one way or the other on the source of funds factor? It moves the needle because the courts routinely, in this court in particular, routinely say this is the most important factor and they keep looking at the source of the funds. And the idea is that you don't want private litigants to be interfering with the state's budget, with the state's money, with the state's FISC. But would the state pay the judgment? Suppose you were liable for a million dollars a year, would the state pay that out of state funds? So there's two questions here I think. One is where do you serve the writ of execution? And another question is are you accessing state funds? And I think the important way to think of it, and I think this is the way that the court in Clark thought about it, is are you accessing state funds? And it's clear here that you are accessing state funds. If you look at Education Code 45.105, it commingles monies coming from the state and monies coming from local taxes and ad valorem taxes on local property holders. All those are commingled into one bucket and the state controls and says this is what you can spend it on. So those are state funds under the Texas Education Code. More importantly, to be sure that the, one of the sources of funds are ad valorem taxes collected from local taxpayers. And those are taxes collected from local taxpayers and the school district assesses and collects those taxes. But in every other material sense, those taxes collected are state funds collected by the school district as an agent for the state in furtherance of the state's obligation to provide constitutional education for all students. Let me ask it this way. So I can imagine two different ways that an alleged arm of the state could pay a judgment. One way is the way, for example,  So if an officer commits a tort, runs into a car while doing a high-speed chase, the Texas legislature has a specific fund, there's a specific procedure, the attorney general's office administers it, checks are cashed, and say it's $20,000 to repair the plaintiff's car, that $20,000 is in addition to, not out of commingled funds, it is in addition to whatever is regularly appropriated to DPS in the General Appropriations Act for that fiscal year. That's one way of doing it. The other way of doing it would be, as I understand the school district is arguing, which is that while we get, say, $1 million from the state, it goes into a big pot, we mingle it with ad valorem taxes we get from the locals, it's all one big mush of money, and then we pull out of that to pay our money judgments when we're on the wrong side of a suit, and so therefore because we are pulling out of commingled funds, we are just like DPS. Am I fairly summarizing? That is, my distinction between the two ways of paying the judgments is irrelevant, because either way it's the arm of the state. Is that fair? If I'm understanding the hypothetical, I think that is, but it's more than just that it's coming out of commingled funds. It's funds that have been determined by the legislature to be necessary, sufficient, for educating the students in the district. Is every private business that receives a PPP loan from the federal government an arm of the federal government? They commingle the money, they say it's necessary for whatever your business purpose is. Would those be arms of the federal government? I don't think they're known under that scenario, but here we have a different scenario where the Texas Education Code, in particular I'm talking about 48.002 and 48.251, has two very important things that are directly relevant to this. One, is it guaranteed, may I continue, Your Honor? Yes. One, it guarantees to each district a sufficient amount of funding to provide for an acceptable level of educational attainment in that district. And acceptable there is a value judgment made by the state commissioner. And two, it promises that if your ad valorem taxes and other local revenues are not enough to reach that level of sufficiency, then the state will appropriate funds. So under your scenario, if someone is able to get a judgment against the district, and the district pays that out of the funds, then that's depleting the amount of funds that the state legislature and the commissioner have determined to be sufficient to reach the basic level of attainment. So what that's doing is it's interfering with the legislature's plan and the commissioner's determination about what is necessary to educate the students in that district. I'll reserve time for you. Yes, thank you, Mr. Williams. Ms. DeNaros? Thank you, Your Honor. Just a few quick points. I want to address Justice Oldham's arguments earlier with regard to the Clark factor when the funds coming from the state. We were kind of confused as well as to why that was such an important factor to the district court and to courts in general. What we had urged for the first round of motions for summary judgment, I think there were three total, was kind of a takings argument, which is something that we revisited, especially in light of the Dobbs decision. If the school districts are an arm of the government and they are going to take someone's intellectual property, then they have to be justly compensated for it. As Justice Oldham said, there are funds that will be paid out for certain tortious acts, and we believe that that's something that's appropriate here. The monies that are being recycled through the school district would have been paid to a company like my client anyways in order to pay for a reading program. So because those monies are staying with the school instead of going to my client, it would make sense that those could actually be satisfied out of a judgment as well. I want to really quickly address a point that my friend brought up talking about that a school district should not have to do a trademark search prior to coming up with a reading program. There is a process that we explored in depth during the depositions, a request for proposal that the school districts put out that my client actually participated in in order to sell their reading programs or math programs or anything like that. That's what should have happened in this instance. They should have bought the reading program from Springboard to Education. Edinburgh ISD did. There is a sole source document that we refer to throughout our pleadings that the ISDs recognize that one company is the source of a certain program. And that all comes down to the intellectual property underpinnings, the trademarks in our case, and sometimes it's patent or copyright. And schools do know about this. All of the teachers that we spoke with at depositions recognize that copyrights and trademarks and patents are important. If you look at McCallum's brief, this is Record on Appeals 1679, it shows a millionaire reader, which is one of the accused infringements, and right above millionaire reader it has a quote from Dr. Seuss and then it has attribution to Dr. Seuss underneath it. So it's one of those things. They know that it's important. They know that it's there. They were aware of my client. My client went and spoke to the school districts, asked for them to buy the program to follow Edinburgh ISD, and he was laughed away. There is kind of a culture down there. I've spent some time down there since we did 40 depositions of kind of disregarding intellectual property rights. And here this is something that because it is in the schools, we need to bring that education down to the students that are our future that these rights need to be protected and respected. They've begun to get more and more important in the last 20 years specifically. I know when I first went out and started practicing on my own, it was hard to find a client to protect their trademarks. I had to kind of pound the podium. But now everybody understands how important this is. All of the biggest companies, that's where they get their money from. They get it from licensing their trademarks. If you look at Coca-Cola, even some of the government contractors, Lockheed Martin, they have their trademarks protected. These ISDs have their trademarks protected. Charter schools have their trademarks protected. It's a source of revenue, and it's something that we need to teach our students today that this is something that you need to respect and hold dear, just like any other property right. I want to briefly address the joint appendix. Your time has expired now, Ms. Ganaris. Thank you. Thank you. Thank you, Your Honor. Williams for Rubeau. Thank you. I just have one brief point to make. What my friend talked about is the idea that there are certain procurement regulations relating to sole source items. What I think I heard was the idea that everyone knows that there are certain sole source items and that trademarks are one of them, and that's not correct. Trademarks are unlike patents and copyrights. A patented item, a copyrighted item, those realistically do have a sole source, either the owner or the licensees. But trademarks are different. Trademarks, the test, the basic test is likelihood of confusion. Someone can use the exact same word or phrase as a registered trademark as long as it doesn't create a likelihood of confusion. So that's why trademarks don't fall into the sole source category, and that's why I think the friends and family witnesses expressed confusion is because they were confused about the sole source aspect, whether that applied to trademarks. Unless the panel has any other questions, I'm going to conclude by saying we rely on our brief for the reign of our arguments. We ask the court to reverse the decision on the 12B1 motion, vacate the judgment, and remand the case to dismiss on the grounds of no immunity, on the grounds of sovereign immunity, thank you. And if the court finds that the district court had jurisdiction, affirm on the grounds of no likelihood of confusion and on the alternative grounds that there was no commercial use. Thank you. All right, thank you, Mr. Williams. The case is under submission. We now call springboards to education.